**Cavit OZLU, Plaintiff,**

v.

**LOCK HAVEN HOSPITAL, Defendant.**
**Civ. No. 72-608.**

United States District Court,
M. D. Pennsylvania.

Jan. 21, 1974.

Robert L. Martin, Litke, Gettig & Flood, Bellefonte, Pa., for plaintiff.

J. Thomas Menaker, McNees, Wallace & Nurick, Harrisburg, Pa., for defendant.

OPINION

MUIR, District Judge.

Plaintiff Dr. Cavit Ozlu brought this diversity action on a breach of contract theory claiming that in November, 1970, he was discharged from his employment as a pathologist with the Defendant Lock Haven Hospital without notice or a hearing as allegedly provided by the contract between the parties. At the first trial held between September 25 and October 1, 1973, the Hospital defended on the ground that Plaintiff substantially breached his contract prior to discharge. On October 1, 1973, a jury verdict in favor of Plaintiff was set aside as being against the great weight of evidence, and the case was reset for trial. By Order dated November 7, 1973, the Court permitted Plaintiff to file an amended complaint, Count I of which added a constitutional claim against the Defend-

ant under the Civil Rights Act. The claim in Count I, that Plaintiff was discharged from his employment without due process, was based upon the same set of facts as the breach of contract claim in Count II of the amended complaint. At the second trial in this case held between December 21, 1973 and January 4, 1974, the jury found in favor of Defendant Hospital on Count II.

Both parties agreed that Plaintiff's civil rights claim in Count I of the complaint was a matter for the Court to decide. Of initial concern to the Court was whether Dr. Ozlu's dismissal was action taken "under color of any statute, ordinance, regulation, custom, or usage, of any State," as required by 42 U.S.C. § 1983. Following a hearing on this issue, the Court concluded that the requisite "state action" was not present, and the parties were informed that Count I would be dismissed for lack of subject matter jurisdiction. This Opinion and Order confirm that conclusion.

Defendant Lock Haven Hospital is chartered as a private, non-profit corporation. Plaintiff contends that Defendant's receipt of substantial funds under the Hill-Burton Act, 42 U.S.C. § 291 et seq., and payments under the federal Medicare and state Medicaid programs, together with the minimum standards imposed upon the Hospital by the Pennsylvania Department of Welfare, render Defendant's dismissal of Dr. Ozlu "state action."

The Hill-Burton Act establishes a program for the disbursement of funds for the construction and modernization of governmentally owned hospitals and voluntary nonprofit hospitals. The programs in each state are administered by designated state agencies pursuant to state-wide plans approved by the Surgeon General of the United States. In 1952, Lock Haven Hospital submitted to the Pennsylvania Department of Health, Education and Welfare, the state agency designated to administer the Hill-Burton program, an application for Hill-Burton funds to aid in defraying costs of constructing a new hospital.

The application was approved for $886,627.55, or approximately one-third of the eligible project cost of $2,632,400. The funds were received in the following years: $445,796.20 in 1960; $338,169.01 in 1961; $84,662.34 in 1963 upon completion of the project. The $886,627.55 in Hill-Burton funds represented 4.2% of the Hospital's gross receipts from 1959–1970. The only condition placed upon receipt of the funds was that the Hospital remain a nonprofit health related facility for twenty years following completion of the new hospital. During construction, the state required the submission of reports demonstrating that the funds were in fact being used for construction costs. Since completion of the project, the Hospital has been required to file a yearly certification that title to the Hospital has not been transferred to a proprietary organization. The Hospital is subjected to no other state involvement as a consequence of participation in the Hill-Burton program.

Defendant Hospital receives substantial amounts of federal and state money for services rendered to individual patients through the Medicare and Medicaid programs. Both of these programs are administered through insurance companies such as Blue Cross. Approximately 35% of the Hospital's income is derived from payments under the Medicare and Medicaid programs. While this appears to be a large figure, it should be noted that over 90% of the Hospital's income comes from insurance companies making payment on behalf of policyholders. (This 90% figure includes Medicare and Medicaid payments). In order to participate in the Medicare and Medicaid programs, the Hospital must meet certain minimum standards of care. These standards are essentially the same as those required for approval by the Pennsylvania Department of Welfare and explained in the following paragraph.

While nonprofit hospitals need no license to operate in Pennsylvania, they must be "approved" by the Pennsylvania

Department of Welfare. The Department of Welfare has established minimum standards for hospitals relating to such matters as general physical requirements of the hospital, sanitation, facilities for diagnosis and treatment of patients, and the keeping of proper medical records. A yearly inspection of the hospital is conducted by the Department of Welfare to ascertain whether the standards are being complied with. There was no evidence presented indicating that there are state minimum standards which apply to the relationship between the hospital and its employees and medical staff or to procedures to be followed in dismissing employees or revoking staff privileges.

In support of his contention that receipt of Hill-Burton funds causes the Hospital to act under color of state law, Plaintiff relies on Sams v. Ohio Valley General Hospital Association, 413 F.2d 826 (4th Cir. 1969); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963); Citta v. Delaware Valley Hospital, 313 F.Supp. 301 (E.D. Pa.1970). To the extent that these cases hold that mere receipt of Hill-Burton funds transforms action by an otherwise private, nonprofit hospital into "state action," I decline to follow them. The Hill-Burton Act creates no causes of action and does not confer upon the federal courts jurisdiction over controversies involving civil rights. Don v. Okmulgee Memorial Hospital, 443 F.2d 234 (10th Cir. 1971). In order to find that a person or organization acted under color of state law, more than receipt of money from the state is necessary. Leslie v. Philadelphia 1976 Bicentennial Corporation, 332 F.Supp. 83 (E.D.Pa.1971); Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D.N.Y. 1968). There is no clearcut test for determining when "state action" arises. As noted by the Supreme Court in Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961), "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." The Court in *Burton* found state action where the state had "so far insinuated itself into a position of interdependence with [a privately owned restaurant] that it must be recognized as a joint participant in the challenged activity." 365 U.S. at 725, 81 S.Ct. at 862.

The evidence presented on this issue revealed that most of the Hill-Burton funds had been received by the Hospital nearly ten years before Dr. Ozlu's dismissal. More importantly, the Hospital was given the funds almost unconditionally, and state involvement in the Hospital's affairs arising as a result of the Hill-Burton grant was practically non-existent. Under these circumstances, Plaintiff failed to show that receipt of funds under the Hill-Burton Act clothed the Hospital with sufficient state authority to constitute state action. Ward v. St. Anthony Hospital, 476 F.2d 671 (10th Cir. 1973).

Nor do payments to the Hospital under the Medicare and Medicaid programs carry with them the obligation to conform to constitutional standards. These programs in effect provide hospitalization insurance to those who might otherwise be unable to afford it. The benefits of Medicare and Medicaid flow not so much to the Hospital, but to the individual patients who are covered by the programs and who receive services from the Hospital.

Finally, it is noted that the Lock Haven Hospital, like most hospitals throughout the United States, is subject to state regulation and inspection. The minimum standards which the Hospital is required to comply with under state law help to insure that patients will receive adequate medical care. The standards are not concerned with the internal decisions of the Hospital officials to hire or fire employees. To find state action arising out of the state regulatory scheme

". . . the state must be involved not simply with some activity of the

institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of the complaint."

Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968). Dr. Ozlu has failed to demonstrate any causal connection between the state's conduct and his injury. Ward v. St. Anthony Hospital, *supra*; Mulvihill v. Julia L. Butterfield Memorial Hospital, 329 F.Supp. 1020 (S.D.N.Y.1971).

For the foregoing reasons, Plaintiff's constitutional claim in Count I was dismissed for lack of subject matter jurisdiction. An appropriate order will be entered.

This Opinion shall constitute the Court's findings of fact and conclusions of law.